******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE QUAMAINE K., JR., ET AL.*
(AC 38532)

DiPentima, C. J., and Lavine and Sheldon, Js.

*Argued March 14—officially released April 8, 2016***

(Appeal from Superior Court, judicial district of
Hartford, Juvenile Matters, Lobo, J.)

*Benjamin M. Wattenmaker*, assigned counsel, for the
appellant (respondent mother).

*Stephen G. Vitelli*, assistant attorney general, with
whom, on the brief, were *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the
appellee (petitioner).

*Opinion*

LAVINE, J. The respondent mother, OV, appeals from the judgments of the trial court terminating her parental rights with respect to three of her children, Q, U, and N.[1] In the termination of parental rights petitions, the petitioner, Commissioner of Children and Families, alleged pursuant to General Statutes § 17a-112 (j) (3) (B) (i) that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of her children, she could assume a responsible position in their lives. On appeal, the respondent claims that the trial court, *Lobo, J.*, (1) erred in finding that, given her intellectual disability, the Department of Children and Families (department) had made reasonable efforts to reunify her with her children, and (2) abused its discretion and violated her federal constitutional right to due process by failing to hold, sua sponte, a hearing to determine her competency to stand trial. We affirm the judgments of the trial court.

The court made the following findings of fact. The respondent has been involved with the department both as a child and as a parent. She was born in Puerto Rico in 1980. When she was five years old, her mother moved to Hartford, leaving the respondent to live with paternal relatives. The respondent was reunited with her mother in Hartford when she was nine years old. The respondent has never completed high school.

Between the ages of fourteen and sixteen, the respondent began to sell illegal substances and abuse marijuana and PCP. She was arrested and placed on probation for two years. When she was eighteen, the respondent assaulted a police officer. She was convicted and served two years at York Correctional Institution, followed by five years of probation.[2] About this time, the respondent attempted to commit suicide. She, therefore, received mental health and medication management services through Hartford Behavioral Health and housing assistance at a YMCA shelter.

The respondent's children mentioned in this opinion are S, who was born in 2002; KP, who was born in 2004; KW, who was born in 2006; Q, who was born in 2007; U, who was born in 2010; and N, who was born in 2012.[3] As a parent, the respondent has been involved with the department since 2000, and neglect allegations regarding one or more of her six children have been substantiated at least nine times. When the respondent gave birth to S, the baby tested positive for PCP. In June, 2004 SP, the father of S and KP, while in the presence of those children, choked the respondent, rendering her unconscious. The respondent, however, lied to the police about the incident because she did not want SP to get in trouble. The department intervened to encour-

age the respondent to engage in domestic violence services offered by Interval House. In January, 2007, the respondent was referred to Intensive Family Preservation through the Klingberg Family Center (Klingberg). The respondent completed the program offered by Klingberg and continued to receive services from Hartford Behavioral Health.

On November 27, 2007, the respondent gave birth to Q, who also tested positive for PCP. On November 30, 2007, the petitioner filed neglect petitions on behalf of Q, S, KP, and KW. The court adjudicated Q, S, KP, and KW neglected in April, 2008, but let them live with the respondent under a one year order of protective supervision, which ended on October 14, 2008. On August 26, 2008, the respondent completed an outpatient substance abuse program. In May, 2010, the department recommended that the respondent participate three days a week in an outpatient substance abuse group.

In June, 2013, the respondent married QK and "celebrated" by using PCP and sharing a pint of Bacardi rum. During the spring of 2013, the respondent was observed to have a black eye on several occasions, including on June 11, 2013, following a domestic incident between her and the mother of QK's other children. That month, the respondent was $3000 behind in her rent and more than $1800 and $1900 behind in gas and electric payments, respectively. She left her six children, ranging in age from five months to eleven years, home alone with no food or milk in the apartment. The children were sleeping on the floor on bare mattresses and some of them were sleeping with the respondent. On June 12, 2013, the respondent was not forthcoming to Hartford police regarding QK's whereabouts, although he was present in the apartment. QK had violated his probation by engaging in domestic violence with the respondent. On June 13, 2013, the respondent attended a school conference for one of her children and was observed to slur her words as if she were under the influence of an intoxicating substance. That same day, QK's probation officer found the respondent to be incoherent, as he had on prior occasions. The police involuntarily committed her for seventy-two hours and referred her for counseling and substance abuse screening.

On June 15, 2013, the respondent was receiving inpatient care, and she tested positive for PCP. She was diagnosed with hallucinogen and alcohol abuse, major depressive disorder, and posttraumatic stress disorder. A clinician at the Wheeler Clinic observed the respondent in a labile mood, talking incoherently, and making threatening statements. Although six daily medications had been prescribed for her, she had run out of her medications because she had failed to pick them up.

The following procedural history is relevant to the

present appeals. On June 22, 2013, the petitioner took custody of all six of the respondent's children on a ninety-six hour hold. The court, *Westbrook, J.*, granted the petitioner temporary custody of the children, finding that they were in immediate physical danger from their surroundings, and ordered preliminary specific steps for the respondent. The court sustained the order of temporary custody on June 28, 2013. On October 30, 2013, the court, *T. Santos, J.*, adjudicated the children neglected and committed them to the custody of the petitioner and finalized specific steps for the respondent.[4] On August 21, 2014, the petitioner filed termination of parental rights petitions concerning Q, U, and N. On April 7, 2015, Judge Lobo appointed a guardian ad litem for the respondent. On April 21, 2015, he approved the permanency plan for termination of parental rights and adoption for the children.[5] The court terminated the respondent's parental rights in Q, U, and N by memorandum of decision filed on September 30, 2015. Additional facts will be set out as necessary.

The standard for termination of parental rights in a child is well known. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase . . . [in which] the trial court determines whether termination is in the best interests of the child." (Footnote omitted; internal quotation marks omitted.) *In re Etta H.*, 146 Conn. App. 751, 755–56, 78 A.3d 295 (2013).

I

The respondent's first claim is that the court erred in finding, for the purposes of § 17a-112 (j) (1),[6] that the department had made reasonable efforts to reunify her with the children in light of the fact that she has an IQ of 60, which the department did not take into consideration when determining what reasonable efforts to make toward reunification. We disagree.

Our Supreme Court has clarified the standard of review for judgments terminating parental rights. See *In re Shane M.*, 318 Conn. 569, 122 A.3d 1247 (2015). It held that "clear error review is appropriate for the trial court's subordinate factual findings, [it] now recognize[s] that the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly, [it] now believe[s] that the appropriate standard of review is one evidentiary sufficiency, that

is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify [the trial court's] [ultimate conclusion]." (Emphasis omitted; footnote omitted; internal quotation marks omitted.) Id., 587–88. "Similarly, the court's determination as to whether the department made reasonable efforts toward reunification is a legal conclusion drawn from the court's subordinate factual findings. Therefore, we apply a clearly erroneous standard of review as to the court's underlying factual findings, and we review the court's legal determinations of reasonable efforts and of failure to rehabilitate for sufficient evidence." *In re Victor D.*, 161 Conn. App. 604, 612, 122 A.3d 1247 (2015). In the present case, the respondent does not challenge the court's underlying factual findings, only its conclusion that the department made reasonable efforts to reunify her with the children.

Judge Lobo made the following additional findings of fact as to the services provided to the respondent. Following the removal of the children from the respondent's care in 2013, the Visiting Nurses Association initially administered and monitored the respondent's medication twice a day, and then progressed over time to once a day, three times a week, and, by March, 2015, twice a week. The Recovery Specialist Voluntary Program was providing case management services in the community for the respondent. She had been referred for counseling and substance abuse screening, but she did not comply with the evaluation. She visited with the children weekly.

On August 15, 2013, the department referred the respondent to three different agencies for domestic violence counseling. The respondent began to receive domestic violence counseling at Interval House, but discontinued it by January, 2014, indicating that she did not need domestic violence support. Also, in August, 2013, Wheeler Clinic recommended inpatient treatment for the respondent due to her behavior, PCP use, and possible cognitive impairment. She was diagnosed with PCP dependence, cannabis abuse, major depressive disorder, and post-traumatic stress disorder. The clinicians at Wheeler Clinic opined that the respondent had poor insight and impaired judgment and recommended that she attend a women's relapse prevention program. At the time, the respondent was receiving mental health care at Hartford Behavioral Health.

Again, in August, 2013, the respondent was referred to the Klingberg Parenting Education Program. She began the program in September, 2013, but failed to complete it. However, she was permitted to reenter the program in January, 2014, and ultimately received a certificate of completion in April, 2014. While she attended the program, the respondent often appeared

to be under the influence of intoxicating substances or cognitively impaired. Her thoughts often were irrational and incoherent. The managers of the program were concerned about the respondent's ability to understand the information and administer the parenting methods and strategies they presented to her.

In November, 2013, the respondent submitted a sample of her hair for drug testing; her sample tested positive for PCP. Community Renewal Team conducted a substance abuse evaluation of the respondent and recommended an intensive outpatient program for her. The respondent completed the six week program, but refused subsequent requests for hair testing. As of March, 2014, the respondent was unemployed, and the department had assisted her to find housing. In April, 2014, the respondent submitted a sample of her hair for testing; again the sample was positive for PCP in all segments going back three months.[7] Community Renewal Team's discharge plan for the respondent was to continue her mental health and substance abuse treatment and her medication management. In October, 2014, the respondent's hair sample was negative for all substances.

The respondent engaged with a therapist at Hartford Behavioral Health to address her post-traumatic stress disorder, adjustment disorder with mixed anxiety and depression, dysthymic disorder, and substance abuse. Initially, the respondent met with her therapist weekly; but she reduced the frequency of her visits over time to once a month. She returned for weekly sessions, however, when she had relapses of anxiety and depression, most recently in April, 2015. Her therapist opined that the respondent was committed and goal-oriented and had demonstrated an ability to manage emotions and resolve issues. Nonetheless, the therapist opined that the respondent still requires individual counseling to deal with her symptoms and coping skills; "she is a work in progress." When the respondent last saw her therapist on May 14, 2015, the therapist informed her that she was to continue therapy twice per week.

The Visiting Nurses Association has continued to monitor and administer the respondent's medication. The schedule has progressed from twice a day visits to once a day, to three times a week in June, 2014, and twice a week in March, 2015. The respondent takes five pills in the morning, two at noon, four in the evening, and four at bed time.

In November, 2013, the respondent and QK were permitted to visit with all six children under the supervision of Beacon Light, but both parents were defiant and oppositional toward the staff. The respondent's response to parenting instruction was not positive, and she had difficulty managing the children. Beacon Light, therefore, withdrew from its supervisory role in May, 2014.

In October, 2014, the department provided two social workers to supervise the respondent's two hour weekly visits with the children at a McDonald's restaurant. Although the respondent visited her children consistently, the department had concerns about her ability to parent. During the supervised visits, the respondent was unable to set limits for the children or to redirect their behavior. She did not interact with them after they ate their meal. The respondent only intervened in disruptive situations when she was prompted by a supervisor. Department personnel noted that the respondent had difficulty processing information and articulating her thoughts.

During one such visit in March, 2015, the respondent was unable to control the children, who were crying, crawling on tables, or talking back to her. She bought them ice cream sundaes for breakfast to settle them down. During a visit in April, 2015, the respondent failed to address, without prompting, what appeared to be fighting among the children. She also encouraged them to come by her home, in disregard of the department's rules. In May, 2015, two of the older children were talking too loudly, and the respondent stated that she was about to "slap the shit out of them." During the same visit, the respondent told S that she watched people "sucking each other at the foster home," which caused the older children to act out further. On the drive home, the respondent stated to QK, in front of the children, that she did not wish to reunify with the two older children. During the supervised visit of June 20, 2015, the respondent called U a "cheating bitch" in reference to a game U was playing.

By the time of trial, the respondent had obtained housing and was residing with QK. She also was working as a home health aide, assisting people with disabilities.

The court made findings of the respondent's mental health diagnoses on the basis of the court-ordered evaluations conducted and authored by Logan Green, an expert in neuro-, clinical, and forensic psychology.[8] Green diagnosed the respondent as suffering from mild intellectual development disorder, mild neurocognitive disorder (acquired brain injury), major depressive disorder, and post-traumatic stress disorder. Green opined that attention deficit hyperactivity disorder needed to be ruled out.

The court found that the respondent had failed to rehabilitate within the meaning of § 17a-12 (j) (3) (B) (i). The court's finding was predicated in part on Green's opinion that, at the time he evaluated the respondent in November and December, 2014, she had not yet shown sufficient competence in caring for her own needs and was unable to place the needs of her children above her own. Green also opined that the issues the respon-

dent was dealing with could not be handled within a year's time and there was no indication that the respondent's attention difficulties could be assuaged. She lacked motivation to complete domestic violence counseling, failed to absorb parenting information, and discontinued individual counseling. Moreover, the respondent continued to exhibit inappropriate behavior during her visits with the children and failed to intervene with the children when necessary.

The court found by clear and convincing evidence that the department had made reasonable efforts to locate the respondent for purposes of § 17a-112 (j) (1) and had assisted the respondent by connecting her with multiple therapeutic providers, social services, and visitation resources, including the Village for Families and Children, My People Clinical Services, Community Renewal Team, Wheeler Clinic, Klingberg, Interval House, Supportive Housing for Families, Hartford Behavioral Health, and the Visiting Nurses Association. The court also found by clear and convincing evidence that the department had made reasonable efforts to reunify the respondent with the children.

The court found that the children had been removed from the respondent's care and adjudicated neglected due to the respondent's substance abuse, domestic violence, failure to address mental health issues, failure to comply with medications, parenting deficits, and unstable housing. The respondent minimized the incidents of domestic violence to avoid getting the perpetrators into trouble, which is part of her psychological profile of perceiving aggressiveness as a natural part of human interaction. It also is a result of the respondent's placing her needs over those of the children and her inability to provide proper child care. Discontinuing domestic violence counseling at Interval House is an example of how the respondent has minimized the violence she has suffered and fails to recognize the psychological, emotional, and physical harm to which she has subjected her children.

The court also found that the respondent faces significant challenges in addressing her mental health issues and not recognizing the effect those issues have on her ability to parent the children. Green described the respondent's profile as indicative of severe psychopathology with multiple psychopathological symptoms that affect her cognitive functioning. Moreover, in late 2014, the issues the respondent was dealing with could not be resolved within a year, and Green did not believe that the respondent's attention difficulties could be overcome.

On appeal, the respondent relies heavily on the recommendations Green offered in his report to substantiate her claim that the department failed to make reasonable efforts to reunify her with the children given her intellectual limitations. Specifically she points to

Green's recommendation that she receive marital therapy for persons who are intellectually disabled and cognitively compromised. Moreover, Green opined that the services of a bilingual therapist are required and treatment requests and suggestions must be communicated in a way that assures the provider that the respondent understood them.

In response to the respondent's claim, the petitioner highlights the serious and numerous issues the respondent was facing at the time the children were removed from her care in June, 2013: substance abuse, domestic violence, mental health problems, poor parenting skills, and unstable housing. The petitioner then recounts all of the services provided to the respondent prior to the adjudication date, August 21, 2014, which included individual psychotherapy to address her mental health and substance abuse issues, referrals to domestic violence programs, medication management provided by the Visiting Nurses Association, locating adequate housing and paying a portion of the rent and security deposit. In addition to parenting classes and instruction, which the respondent often rejected, Klingberg and Beacon Light arranged hands-on visitation for the respondent with the children. The petitioner, too, relies on Green's evaluation in support of her position that the department made reasonable efforts to reunify the respondent with the children, specifically his opinion that "the most important service at this point is that of a visiting nurse who can administer [the respondent's] medications as often as needed throughout the day." The petitioner also notes that the crux of the respondent's argument is that the department did not implement all of Green's recommendations, which were authored months after the adjudication date.[9]

In considering whether the department made reasonable efforts, "[t]he word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Samantha C.* 268 Conn. 614, 632, 847 A.2d 883 (2004). The department is required to take into consideration a respondent's mental condition when determining what reasonable efforts to make at reunification. *In re Antony B.*, 54 Conn. App. 463, 475, 735 A.2d 893 (1999). The court considers events that have occurred prior to the date the petition was filed to determine whether reasonable efforts at reunification were made. See *In re Shaiesha O.*, 93 Conn. App. 42, 48, 887 A.2d 415 (2006). In the present case, the petitions for termination of the respondent's parental rights were served on August 21, 2014.

On the basis of our review of the record, the briefs, and the arguments of the parties, we conclude that the court's finding by clear and convincing evidence that the department made reasonable efforts to reunify the respondent with Q, U, and N was not in error. The department assisted the respondent by referring her to numerous social service agencies and medical providers to deal with her needs and to help her complete the specific steps toward reunification ordered for her. The role of the Visiting Nurses Association in assuring that the respondent took her medication cannot be overstated given the respondent's significant mental health and substance abuse issues, which addressed what Green described as the respondent's most pressing need. Green also opined that in addition to psychotropic medication administered by the Visiting Nurses Association, the respondent's mental health issues best would be addressed through psychotherapy. The department referred her to a psychotherapist who provided her with assistance in learning to control her emotions and her behavior. The respondent, however, rejected some of the services offered by the department, particularly services related to domestic violence and parenting. Although the respondent was apprised of the need to avoid illegal substances, the respondent often refused to submit to hair testing. The first time one of her hair samples tested negative for illegal substances was in October, 2014. The department also found suitable housing for the respondent, in further support of one of her specific steps.

The court found that the respondent made some progress pursuant to her own court-ordered specific steps. The respondent, however, remains emotionally labile and finds hostility to be a normal part of life. She struggles to provide adequately for her own daily needs, and she is unable to provide appropriate child care for her children within a supervised setting. She puts her needs above those of her children. The respondent's complacency during Green's evaluation and during her visits with the children, as well as the inappropriate comments she makes to them, suggest that she has poor empathy for her children. When parents lack empathy for their children, the children feel unwanted or that they have done something wrong, or both. The court found that these factors indicate that the respondent is unable to assume an appropriate role as the children's parent anytime in the near future. Green, in fact, testified that, even if the respondent were fully engaged in services, it would take more than a year before reunification might be a possibility. In view of the need for stability and permanency for Q, U, and N, the court found that it is in their best interest to terminate the respondent's parental rights.

For the forgoing reasons, the respondent's first claim fails.

## II

The respondent's second claim is that the trial court abused its discretion and violated her right to due process under the federal constitution by failing, sua sponte, to hold a hearing to determine her competency to stand trial where the record before the court contains specific factual allegations that, if true, would raise a reasonable doubt about her competency. We disagree.

This court recently decided a similar reviewability claim in *In re Glerisbeth C.*, 162 Conn. App. 273, 279, 130 A.3d 917 (2015), cert. denied, 320 Conn. 921, A.3d    (2016). As in the present case, the respondent mother in *In re Glerisbeth* failed to preserve her similar due process claim for appeal and sought a reversal of the termination of parental rights judgments pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The *Golding* standard is well known. An appellant can prevail under *Golding* only if "*all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [appellant] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) Id., 239–40; see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (deleting word clearly from third *Golding* prong). The first two prongs of *Golding* concern whether the appellant's claims are reviewable; the second two prongs concern whether the appellant can prevail on the claim raised. See *State* v. *Ducharme*, 134 Conn. App. 595, 605, 39 A.3d 1183, cert. denied, 305 Conn. 905, 44 A.3d 181 (2012).

The respondent's claim satisfies the first and second prongs of *Golding*, as the record is adequate for review and her claim is of constitutional magnitude. A parent's right to raise his or her child is recognized as a basic constitutional right. See *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *Lehrer* v. *Davis*, 214 Conn. 233, 236, 571 A.2d 691 (1990). We, therefore, have reviewed the record to determine whether the alleged constitutional violation exists and deprived the respondent of a fair trial. We conclude that the respondent was not deprived of her constitutional right to raise her children without due process of law.

Our Supreme Court addressed the issue of a respondent parent's right to a competency hearing in *In re Alexander V.*, 223 Conn. 557, 560, 613 A.2d 780 (1992). After balancing the interests of those parties pursuant the test established in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), the court

concluded that due process does not invariably require a trial court to hold a hearing on the competency of a respondent parent to stand trial in a termination of parental rights proceeding. Id., 566. The court observed that competency proceedings inherently delay a trial; id., 565; and that "[c]hildren involved in termination proceedings have a strong interest in the speedy resolution of such proceedings, for regardless of their outcome, their final resolution promotes permanency in the children's family relationships and stability in their lives. . . . The promotion of those objectives may be put at risk, if not fatally compromised, by injecting undue delay for any purpose into a termination proceeding." (Citation omitted.) *In re Glerisbeth C.*, supra, 162 Conn. App. 280. Due to the "psychological effects of prolonged termination proceedings on young children, time is of the essence . . . ." (Internal quotation mark omitted.) *In re Alexander V.*, supra, 565.

After balancing the "legitimate interests of respondent parents not to have their parental rights terminated while they are incompetent to stand trial and the legitimate interests of their children to have termination proceedings brought to an expeditious conclusion, due process requires that competency hearings be conducted as to respondent parents in termination proceedings in two . . . situations." *In re Glerisbeth C.*, supra, 162 Conn. App. 281. Due process requires a competency hearing in termination of parental rights cases "only when (1) the parent's attorney requests such a hearing, or (2) in the absence of such a request, the conduct of the parent reasonably suggests to the court, in the exercise of its discretion, the desirability of ordering such a hearing sua sponte. In either case, the standard for the court to employ is whether the record before the court contains specific factual allegations that, if true, would constitute substantial evidence of mental impairment. . . . Evidence is substantial if it raises a reasonable doubt about the [parent's] competency . . . ." (Citations omitted; internal quotation marks omitted.) *In re Alexander V.*, supra, 223 Conn. 566.

"By definition, a mentally incompetent person is one who is unable to understand the nature of the termination proceeding and unable to assist in the presentation of his or her case." Id., 563. If any evidence of record has the potential to raise a doubt as to a respondent parent's ability to understand the proceedings against him or her and to assist counsel in the presentation or defense of the case, the court must exercise its discretion to determine whether the evidence actually raises a reasonable doubt as to the parent's present competency to stand trial. *In re Glerisbeth C.*, supra, 162 Conn. App. 282. "[T]he standard for the court to employ is whether the record before the court contains specific factual allegations that, if true, would constitute substantial evidence of mental impairment." (Internal quotation marks omitted.) *In re Alexander V.*, supra, 223

Conn. 566.

The focus of a competency inquiry is the parent's ability at the time of trial to assist counsel with a rational and factual understanding of the termination proceedings. The trial court, therefore, "is in a particularly advantageous position to observe a [parent's] conduct . . . and has a unique opportunity to assess a [parent's] competency. A trial court's opinion, therefore, of the competency of a [parent] is highly significant." (Internal quotation marks omitted.) *In re Kaleb H.*, 131 Conn. App. 829 837, 29 A.3d 173 (2011), aff'd, 306 Conn. 22, 48 A.3d 631 (2012). "A competent [parent] . . . is able to provide . . . counsel with the data necessary or relevant to the structuring of [the] case . . . and information to rebut evidence offered by the state . . . . The test for competency is whether the respondent has sufficient present ability to consult with [counsel] with a reasonable degree of rational understanding and whether [the parent] has a rational as well as factual understanding of the proceedings . . . ." (Citations omitted; internal quotation marks omitted.) *In re Kaleb H.*, 306 Conn. 22, 32, 48 A.3d 631 (2012).

On appeal, the respondent contends that the court abused its discretion by failing to order sua sponte a competency hearing because the record includes substantial evidence of her mental impairment. Specifically, the respondent points to the court-ordered psychological and neuropsychological reports authored by Green, indicating that she has an IQ of 60, a mild intellectual development disorder, a mild neurocognitive disorder, and acquired brain syndrome, which seriously affects her capacity for attention and impulse control. She contends that Green's report is substantial evidence that should have raised a reasonable doubt in the mind of the court as to whether the respondent had a sufficient ability to consult with and understand counsel and whether she was capable of a rational or factual understanding of the trial. The court, therefore, should have ordered a competency hearing for her.

The respondent also relies on the representations of her counsel at a hearing held on April 7, 2015.[10] At that time, counsel stated that the respondent had great difficulty understanding even the revocation of the petitioner's custody of KW and objected to KW's being placed with his father. He represented that, according to the respondent, she did not understand him and that he did not explain things to her. Counsel for the respondent requested, on the basis of Green's neuropsychological evaluation, that a guardian ad litem be appointed for the respondent. Judge Lobo granted counsel's request, stating that a guardian ad litem may be able to help the respondent understand the process.

The petitioner, on appeal, argues that the respondent cannot satisfy the third *Golding* prong because she failed to demonstrate that the court violated her consti-

tutional right to family integrity and that the record does not support her claim that her mental impairment called into question her ability to understand the termination proceedings or to assist her counsel. The petitioner concedes that the respondent is mentally impaired and has mental health issues, but contends that the respondent has not explained how Green's diagnoses and her behavior were substantial evidence of a mental impairment that prevented her from understanding the nature of the proceedings or to assist her counsel. Moreover, the petitioner argues the record does not support the respondent's claim that she did not understand the nature of the termination of parental rights proceedings.

In support of her position, the petitioner has directed us to the transcript of the April 7, 2015 hearing before Judge Lobo. During the hearing, the respondent's counsel stated to the court that the respondent had difficulty understanding the proceedings and that the respondent wished to address the court directly. The court explained to the respondent that it is better to let counsel speak for her. The respondent stated: "He's not helping me at all." She also stated that the last time she had appeared before the court, the court informed her that she "was doing good . . . and [to] bring you a clean hair sample and I did." Although the court sought to interrupt the respondent, she continued stating: "I deserve my kids; there's six. I hold six kids in my stomach. They're my kids. I hold them in my stomach. . . . I brought those kids up myself. . . . And I'll do anything for them . . . . Really a lot. Every Saturday those kids cry to me . . . . I suffer every Saturday . . . . I can't hold it no more. I need my childrens back home. . . . I need them home. It's easy for you to say 'Come back in June. Come back in August. Come back in September.' . . . I'm a good mother; I never abuse my kids. They was doing good in school, better than they doing now. They came out on the news, on channel three." The court stated in response, "I understand your position."

The petitioner also has brought to our attention the pretrial hearing held on April 21, 2015, at which the court, *Dannehy, J.,* presided. Judge Dannehy first addressed the motion to withdraw that had been filed by the respondent's counsel. Counsel represented to the court that he had filed the motion in response to the respondent's representations to Judge Lobo that she wanted another attorney because she was dissatisfied with him. When asked by the court, the respondent indicated that she was not going to retain her own counsel. Judge Dannehy denied the motion to withdraw, stating that there was not enough time for new counsel to prepare before trial and "quite frankly, I have a feeling you would probably be unhappy with their services, as well."[11]

Judge Dannehy also commented on the appointment of a guardian ad litem for the respondent, stating "there is really no legal necessity to have a [guardian ad litem]. In my review of the psychological, the psychological and neuropsych[ological reports], there is no indication that [the respondent] is not competent."[12] Counsel for the respondent voiced no objection to the court's finding that the respondent was competent.[13]

The petitioner also directs us to the respondent's behavior at trial as evidence of her competence to stand trial. On the first morning of the consolidated trial on June 22, 2015, the respondent's counsel stated to the court that the respondent was withdrawing her objection to the permanent guardianship transfer of S and KP to their paternal aunt and the revocation of KW's commitment in favor of his father. See footnote 5 of this opinion. Counsel informed the court that the respondent was withdrawing her objections pursuant to conversations she had with him and her guardian ad litem. The respondent's counsel asked the court to canvass the respondent. The court proceeded to canvass the respondent with respect to the revocation of commitment regarding KW.[14] Thereafter, the court canvassed the respondent in a similar fashion regarding the permanent transfer guardianship with respect to S and KP.[15] The court asked all counsel present if anyone knew of a reason not to accept the respondent's consent; no counsel, including the respondent's counsel, voiced such a reason.

The petitioner provided other examples of the respondent's behavior during the course of the trial, which the petitioner claims support her position that the respondent understood the proceedings. The examples include the respondent's interrupting testimony to clarify where the Visiting Nurses Association met with her, QK was arrested, not convicted, the number of times QK tested positive for benzodiazepine, and the frequency of her therapy sessions . In addition, as her counsel argued, the respondent was employed as a home health aide, who was responsible for providing direct, daily care assistance to a blind woman and a wheelchair-bound man. She also managed her own finances. Moreover, the respondent interacted with numerous mental health professionals and none of them ever questioned her ability to understand the termination of parental rights proceedings.

In her reply brief, in response to the evidence that Judge Lobo canvassed her twice on June 22, 2013, and that she appropriately interjected several times during the termination trial, the respondent quotes from the transcript of the hearing before Judge Lobo on April 7, 2015. Immediately prior to the following colloquy, counsel representing S and KP had stated that the girls supported the plan for the permanent transfer of their guardianship to their paternal aunt. The respondent

spoke out.

"[The Respondent]: Do you know they kik? Do you know they on kik?

"The Court: Ma'am, ma'am, ma'am. Ma'am. Ma'am.

"[The Respondent]: Do you know they on kik?

"The Court: Ma'am.

"[The Respondent]: Talking to other people? Do you know that they talking to other guys? . . . Do you know they on kik? . . . Can you answer me that? . . . They on kik; talking to other mens. Can you find out about that?"[16] No one at the time the respondent interrupted the proceedings, not the court, her counsel, or counsel representing the S and KP, asked the respondent what she meant by "do you know they on kik." On appeal, the respondent argues that her statements on April 7, 2015, indicate that she did not fully understand the proceedings.

Our task is to review the record to determine whether Judge Lobo abused his discretion by not sua sponte ordering a competency hearing for the respondent. "In determining whether a trial court has abused its discretion, an appellate court must make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for manifest abuse of discretion. . . . Accordingly, review of [discretionary] rulings is limited to questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . . In determining whether the trial court [has] abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action. . . . This standard of review applies no less to a discretionary determination not to act sua sponte when to do so is required by law in particular circumstances than to a discretionary ruling expressly granting or denying a request by counsel that the court so act. Presuming, as we must in the absence of clear evidence to the contrary, that the court was well aware of its legal duty to conduct a hearing to determine the respondent's competency to stand trial if the evidence before it raised a reasonable doubt as to her present ability to understand the proceedings against her and to assist counsel in the presentation of her case . . . we treat its failure to order such a hearing as the result of its discretionary determination that no such action was called for in the circumstances before it." (Citations omitted; internal quotation marks omitted.) *In re Glerisbeth C.*, supra, 283–84.

The essence of the respondent's claim on appeal is that Green's diagnosis of her mental impairments constitutes substantial evidence of her lack of competency for trial. The respondent's claim fails because she has conflated her mental health history with her cognitive ability to understand the termination proceedings and to assist her counsel at trial. Moreover, the substantial

evidence in the record demonstrates that the respondent comprehended the termination of parental rights proceedings and was able to assist her counsel. Although the respondent should not have spoken out during the testimony of others, her statements demonstrate that she understood the examinations being conducted and the testimony being given, as her statements were germane to the topics of inquiry.

The respondent's outburst before Judge Lobo on April 7, 2015, demonstrates that she was aware of her older daughters' social media activities and she questioned whether the department was aware of them. She made an impassioned plea in response to the court's prior statements that she was doing well and she provided a clean hair sample. She also explained her need for her children to be with her. The court responded that it understood her feelings, a clear indication that the court did not find her unable to understand the termination proceedings.[17]

We conclude that the respondent's behavior indicates that she understood the consequences of the termination of parental rights proceedings, if not why her children were being removed. In that regard, we share the sentiments expressed by this court in *In re Glerisbeth C.* The respondent mother's claim in that case that she did not understand the petitioner's actions against her evidenced "not a lack of understanding of the nature of the termination proceedings, but a fundamental disagreement with the [petitioner] as to her ability to be an effective parent for her children." *In re Glerisbeth C.*, supra, 162 Conn. App. 293. Evidence that the respondent in the present case disagreed with the petitioner's actions was most evident on April 7, 2015, when she stated to Judge Lobo that her counsel was not helping her, that the court previously had informed her that she was doing well, and that she provided a clean hair sample. In the respondent's mind, she was doing what was asked of her, but the termination proceedings were proceeding apace. At that time, the respondent made abundantly clear that she knew her children were to be removed from her, but that she disagreed. She pleaded that she was a good mother, that she suffered when she was separated from her children, and that she needed them to be at home with her. This portion of the record in particular contradicts any argument that the respondent's conduct before Judge Lobo reasonably suggested that he should order a competency evaluation. See *In re Kaleb H.*, supra, 306 Conn. 32; *In re Alexander V.*, supra, 223 Conn. 566.

On the basis of our review of the record, the briefs of the parties and their oral arguments, we conclude that the court did not abuse its discretion or violate the respondent's right to due process by not ordering, sua sponte, a competency evaluation of the respondent. The respondent's claim, therefore, fails under the third

prong of *Golding*.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** April 8, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The parental rights of the respondent father, QK, also were terminated, but he is not a party to this appeal. We, therefore, refer to OV as the respondent.

[2] The court found that the respondent's criminal history spans the years 1998 through August, 2012, and includes, but is not limited to, charges of first and second degree assault, possession of narcotics, carrying a weapon, assault on personnel, second degree larceny, and failure to appear.

[3] SP is the father of S and KP; BW is the father of KW.

[4] The specific steps included, among other things, engaging in treatment to learn safe and nurturing parenting, gaining insight on the impact of her substance abuse and mental health issues on the children, addressing substance abuse, mental health and domestic violence issues, abstaining from illegal drugs, maintaining adequate housing and legal income, taking all medications as prescribed, avoiding the criminal justice system, and learning to take care of the children's physical, educational, medical, and emotional needs.

[5] Also before the court was a permanency plan that transferred custody of S and KP to their paternal aunt and revoked the commitment of KW, who was in the custody of his father. The respondent objected to this plan as of April 21, 2015.

[6] General Statutes § 17a-112 (j) provides in relevant part that the court "may grant a petition [to terminate parental rights] if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and reunify the child with the parent . . . (2) termination is in the best interest of the child, and . . . (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[7] The analysis of a hair follicle may reveal the presence of drugs consumed within the past three months.

[8] The evaluations were conducted in November and December, 2014. Green's reports are dated February 17 and March 10, 2015.

[9] The respondent specifically faults the petitioner for not implementing Green's recommendations with respect to the manner in which services were provided to her and for failing to take advantage of some of the programs and services Green suggested. Green's report was distributed to the parties three or four months prior to trial in June, 2015, and well after the adjudication date.

[10] The hearing before Judge Lobo concerned the permanency plans for each of the respondent's six children. The respondent had filed objections to each of the plans. The purpose of the hearing was to consolidate the matters for trial.

[11] Judge Dannehy further stated to the respondent: Your counsel "is a very good attorney. He is very qualified. He is very skilled. He is very experienced. He might be the bearer of bad news to you. You may not like what he is telling you, but it is not a question of his competence or his willingness to work on your behalf. It's just unfortunately that he has to tell you what [the department] wants to do. And you're unhappy with the message that you are getting from him and not his ability to represent you."

[12] Nonetheless, Judge Dannehy continued the guardian ad litem's appointment for the respondent.

[13] The petitioner also notes that in his final argument, counsel for the respondent emphasized evidence of the respondent's competence, particularly that she had been employed for more than one year and that she should be provided more time to pursue rehabilitation.

[14] The court canvassed the respondent as follows.

"The Court: I'm going to initially ask you questions regarding [KW's] revocation. All right? For that piece first. And then I'll ask you questions regarding the transfer of guardianship piece. All right? And again, if you have any questions regarding my question, you have your attorney, you have your guardian ad litem, as well as myself to try to clarify any of those issues for you. Okay? Does that make sense?

"[The Respondent]: Yes.

"The Court: All right. As to the revocation today, are you under the influence of any alcohol, drugs, or medication that would negatively impact your ability to understand what's happening here today?

"[The Respondent]: Yes, yes. I understand everything you say.

"The Court: Well, but do you understand?

"[The Respondent]: Yes.

"The Court: Okay. So none of the medications or anything are negatively impacting you?

"[The Respondent]: No, no.

"The Court: Okay. As to the revocation, the motion to revoke commitment, did your attorney . . . or your guardian ad litem, discuss with you, what the state would need to prove at trial as far as effectuating that revocation, as well as all the evidence the state claims it has for that revocation?

"[The Respondent]: Yes.

"The Court: Do you understand by agreeing to the revocation, you are giving up certain rights? You are giving up your right to remain silent. You're giving up your right to a trial before a judge with the assistance of your attorney as to the revocation. You're giving up your right to continue to deny the attempts to revoke commitment and have the petitioner prove that revocation by a fair preponderance of the evidence, a little bit more than not. You are giving up your right to cross-examine the state's witnesses, to call your own witnesses, to testify in your own behalf, if you so chose, although no one could force you to testify. You are giving up your right to continue to present a defense to the motion to revoke. Do you understand you are giving up those rights?

"[The Respondent]: Yes.

"The Court: Has anyone threatened you or promised you anything, other than what we've talked about in court today, in order to get you to agree to that revocation?

"[The Respondent]: No.

"The Court: Is there anything that I asked you regarding the revocation that you do not understand?

"[The Respondent]: No.

"The Court: Does any counsel know of any reason why or any reason why the court should canvass further?

* * *

"The Court: No. You will still—there will still be a trial as to the termination petition regarding [Q, U, and N]; do you understand that? Yes?

"[The Respondent]: Yeah.

"The Court: An by agreeing on the other three children as to the transfer of guardianship and the revocation, that agreement that you are making in no way negatively impacts your position as to the termination petitions; do you . . . that?

"[The Respondent]: Yes.

"[The Respondent's Counsel]: Your Honor, just to clarify further, my client in our conversation with me, with the [guardian ad litem] present, did understand that the termination of parental rights trial will go forward.

"The Court: Yes.

"[The Respondent's Counsel]: That she understands that now we can just concentrate on the three [K] children. She understands that. That's just another way of paraphrasing that she does understand.

"The Court: Thank you."

[15] After it canvassed the respondent, the court approved the permanency plans for KW and for S and KP.

[16] The transcript of the respondent's statements provides: "Do you know they kick? (sic) Do you know they on kick?" The use of the term sic indicates that the court monitor was not confident about the spelling of the word. Given the context of the respondent's remarks, she very possibly was referring to Kik Messenger. "Kik Messenger, also called Kik, is an instant messenger application (app) for mobile devices from Kik Interactive, available free of charge on iOS, Android, and Windows Phone operating systems. . . . Kik is known for its features preserving users' anonymity, such as allowing

users to register without providing a telephone number, and preventing users from being located on the service . . . . Kik Messenger has drawn controversy due to its reported involvement in a number of incidents of child exploitation. The app has been criticized as unsafe for minors due to its anonymity features and allegedly weak parental control mechanisms." (Footnotes omitted.) Kik Messenger, Wikipedia, the free encyclopedia, available at http://en.wikipedia.org/wiki/Kik_Messenger (last visited April 8, 2016).

[17] We also note that during those proceedings, at no time did anyone providing services to the respondent suggest to the court that she was not competent.

----